**PAWAR LAW GROUP, P.C.**
Vik Pawar
20 Vesey Street, Suite 1210
New York, NY 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRENT NICHOLS and SHARON NICHOLS, derivatively on behalf of COCRYSTAL PHARMA, INC. F/K/A BIOZONE PHARMACEUTICALS, INC., | Case No.: |
| Plaintiffs, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| vs. | **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** |
| ELLIOTT MAZA, GARY WILCOX, JEFFREY MECKLER, GERALD MCGUIRE, JAMES MARTIN, CURTIS DALE, RAYMOND SCHINAZI, DAVID BLOCK, PHILLIP FROST, JANE H. HSIAO, STEVEN RUBIN, BRIAN KELLER, BARRY C. HONIG, JOHN STETSON, MICHAEL BRAUSER, JOHN O'ROURKE III, MARK GROUSSMAN, and JOHN H. FORD, | **(2) BREACH OF FIDUCIARY DUTY;** **(3) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;** **(4) UNJUST ENRICHMENT; AND** **(5) WASTE OF CORPORATE ASSETS** |
| Defendants, | JURY TRIAL DEMANDED |
| and | |
| COCRYSTAL PHARMA, INC. F/K/A BIOZONE PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## INTRODUCTION

Plaintiffs Trent Nichols and Sharon Nichols ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Cocrystal Pharma, Inc. f/k/a BioZone Pharmaceuticals, Inc. ("Cocrystal" or the "Company"),[1] file this Verified Shareholder Derivative Complaint against Individual Defendants Elliott Maza, Gary Wilcox, Jeffrey Meckler, Gerald McGuire, James Martin, Curtis Dale, Raymond Schinazi, David Block, Phillip Frost, Jane H. Hsiao, Steven Rubin, Brian Keller, Barry C. Honig, and Michael Brauser, (collectively, the "Individual Defendants") for breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Cocrystal, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder, and against John Stetson, John O'Rourke III, Mark Groussman, and John H. Ford for aiding and abetting the foregoing misconduct.[2] As for their complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cocrystal, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

---

[1] The "Company" and/or "Cocrystal" as used herein refer to both Cocrystal Pharma, Inc. and BioZone Pharmaceuticals, Inc. unless otherwise indicated.

[2] John Stetson, John O'Rourke III, Mark Groussman, and John H. Ford are referred to collectively herein as the "Outside Individual Defendants." The Individual Defendants, Outside Individual Defendants, and Nominal Defendant Cocrystal are referred to collectively as "Defendants."

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action that seeks to remedy wrongdoing committed by Cocrystal's directors, officers, and controlling shareholders starting on September 23, 2013 and continuing through the present (the "Relevant Period").

2.  BioZone Pharmaceuticals, Inc. ("BioZone") was headquartered in Englewood Cliffs, New Jersey, and created through a reverse merger of a private biotech company into a publicly traded shell company in June 2011. This approach to taking a company public, despite being legal, is considered indicative of shady dealing, because it is typically used to bypass the rigorous regulatory and underwriter scrutiny of a traditional initial public offering.[3]

3.  BioZone merged with Cocrystal Discovery, Inc. on or about January 3, 2014 through a reverse merger (the "Merger"). The resulting entity was renamed Cocrystal Pharma, Inc.

4.  Cocrystal operates as a clinical stage biotechnology company, engaging in discovery and development of various novel antiviral therapeutics targeting the replication machinery of various viruses.

5.  During the Relevant Period, the Individual Defendants and a number of individuals and entities not named herein coordinated to orchestrate pump-and-dump schemes involving BioZone.

6.  A number of the Individual Defendants, after completing the reverse merger to create BioZone, took control of the newly created company buy amassing as many cheap shares

---

[3] *E.g.,* Luis A. Aguilar, Commissioner, Securities and Exchange Comm'n, Facilitating Real Capital, Address at the Council of Institutional Investors Spring Meeting (April 4, 2011), available at https://www.sec.gov/news/speech/2011/spch040411laa.htm.

as possible. Often, this was accomplished through entering into deals that benefitted the Frost Conspirators at the expense of the Company: a prime example is the Company's August 2018 agreement with MusclePharm Corporation. In this agreement, the Frost Conspirators pawned off almost all of BioZone's assets in exchange for more cheap shares.

7.       Defendants Philip Frost ("Frost"), Barry C. Honig ("Honig"), John Stetson ("Stetson"), Michael Brauser ("Brauser"), John O'Rourke III ("O'Rourke"), and Mark Groussman ("Groussman") along with a group of other individual and institutional investors (the "Frost Conspirators"), several of whom had ownership interests in BioZone, commissioned stock promoters (including, but not limited to, Defendant John H. Ford ("Ford")) to write positive articles about BioZone in September 2013, and engaged in manipulative trading which artificially raised the price of BioZone shares. The Frost Conspirators then sold their shares in a coordinated fashion from September to December of 2013, thereby enriching themselves at the expense of other investors. The Frost Conspirators failed to disclose that they were operating as a group, or that they were not passive investors. The misconduct alleged in this paragraph is referred to collectively herein as the "Pump & Dump Misconduct."

8.       In order to facilitate the Pump & Dump Misconduct, Defendants Frost, Brauser, Honig, Brian Keller ("Keller") and Elliott Maza ("Maza") were parties to an agreement to acquire, hold, or sell their shares of BioZone in concert.

9.       As of April 1, 2013, Defendants Frost, Brauser, Honig, Keller and Maza, combined with entities controlled by one or more of those Individual Defendants, possessed, in the aggregate, nearly 71% of BioZone's outstanding shares.

10.       The Pump & Dump Misconduct was revealed on September 7, 2018, when the SEC filed a complaint against Defendants Frost, Honig, Stetson, Brauser, O'Rourke, Groussman, Maza,

Keller, and Ford, as well as Opko Health, Inc. ("Opko") and a number of other individual and entity defendants in the United States District Court for the Southern District of New York (the "SEC Action"). Though Cocrystal was identified only as "Company A" in the SEC's complaint, it was immediately apparent to investors and analysts that the Company was the only entity that met the SEC's description. The SEC issued a press release the same day announcing the filing of the complaint.

11.     On this news, the price of Cocrystal stock dropped $0.54 per share, or 14.4%, from the previous day's closing price, closing at $3.20 per share a on September 7, 2018. The share price continued to fall, closing at $3.16 on September 10, 2018, the following trading day.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

13.     Also during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was the subject of the Pump & Dump Misconduct; (2) Defendants failed to disclose that MusclePharm was a related party, in violation of generally accepted accounting principles ("GAAP") and SEC rules and regulations; (3) as a result of the foregoing, the Company would be subject to regulatory scrutiny from government agencies, including the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

14.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

15.     The Individual Defendants' misconduct, and the Outside Individual Defendants' aiding and abetting thereof, has subjected the Company, its Chief Executive Officer ("CEO"), its former CEO, its Chief Financial Officer ("CFO"), two of its former CFOs, and the former CEO & CFO of BioZone to being defendants in a federal securities fraud class action lawsuit in the United States District Court for the District of New Jersey (the "Securities Class Action"); the need to undertake internal investigations, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company has had and will have to expend many millions of dollars.

16.     The Individual Defendants' misconduct also subjected Defendants Frost and Keller, as well as Opko to a pro se action in the United States District Court for the District of Minnesota for fraud and tortious interference with prospective business advantage (the "Pro Se Action"). On July 11, 2018, the Honorable Magistrate Judge Becky R. Thorson issued a Report and Recommendation recommending, among other things, that the Pro Se Action be dismissed without prejudice for lack of personal jurisdiction over the defendants. On September 13, 2018, the Honorable Judge Wilhelmina M. Wright adopted Magistrate Judge Thorson's Report and Recommendation, dismissing the Pro Se Action.

17.     Several of the Individual Defendants settled the claims brought against them in the SEC Action, beginning with Defendant Ford on September 21, 2018. He was soon followed by Defendants Frost (and the entities he controls, Frost Gamma Investments Trust ("FGIT") and

Opko, Groussman (and the entity he controls, Melechdavid, Inc.), Maza, Keller, and Honig (as well as his investment vehicle, GRQ Consultants, Inc. and a Lichtenstein corporation with whom he is linked, Alpha Capital Anstalt[4]).

18.     At the time of filing of this complaint, the remaining defendants in the SEC Action include: Defendant Brauser (and his investment vehicle, Grander Holdings, Inc.), Defendant O'Rourke (and his investment vehicle, ATG Capital LLC), Defendant Stetson (and his investment vehicles, Stetson Capital Investments Inc. and HS Contrarian Investments, LLC[5]). The final defendant remaining in the SEC Action is non-Defendant Robert Ladd, the former CEO of MabVax Therapeutics, Inc., another company involved in a separate pump-and-dump scheme with many of the Individual Defendants.

19.     The Company has been substantially damaged as a result of the Individual Defendants' aiding and abetting thereof knowing or highly reckless breaches of fiduciary duty and other misconduct and the Outside Individual Defendants' aiding and abetting thereof.

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, including all of the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the interim CEO, former CEO, CFO, two former CFOs, and the former CEO & CFO of BioZone's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Cocrystal Board of Directors (the "Board") cannot

---

[4] The SEC Action alleges that Alpha Capital Anstalt assisted Defendant Honig in securing fraudulent attorney letters, which are discussed in further detail below.
[5] Defendant Stetson co-owns HS Contrarian Investments, LLC with Defendant Honig, who settled with the SEC on June 17, 2019.

consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

25.     Venue is proper in this District because Cocrystal is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

26.     Plaintiffs are current shareholders of Cocrystal. Plaintiffs have continuously held Cocrystal common stock at all relevant times.

**Nominal Defendant Cocrystal**

27.     Cocrystal is a Delaware corporation with its principal executive offices at 19805 North Creek Parkway, Bothell, WA 98011. Prior to the merger, BioZone shares traded on the OTC under the ticker symbol "BNZE." From the time of a 1-for-30 reverse stock split on January 24, 2018, and for twenty business days thereafter, the Company's shares traded on the OTC under the ticker symbol "COCPD." Thereafter Cocrystal's shares traded under the ticker symbol "COCP." Cocrystal's shares have traded on the NASDAQ since March 12, 2018.

**Defendant Wilcox**

28.     Defendant Dr. Gary Wilcox ("Wilcox") has served as the Company's CEO since July 22, 2016, as a Company director since January 2014, and as Chairman of the Board since February 1, 2019. He previously served as Chairman of the Board and CEO from January 2014 to March 1, 2015. He also previously served as CEO from 2008 to March 2015. According to the Company's Schedule 14A filed with the SEC on April 30, 2019 (the "2019 Proxy Statement"), as of April 24, 2019, Defendant Wilcox beneficially owned 564,952 shares of the Company's common stock, which represented 1.8% of outstanding shares on that date. Given that the price per share of the Company's common stock at the close of trading on April 30, 2019 was $2.55, Wilcox owned over $1.4 million worth of Cocrystal common stock.

29.     For the fiscal year ended December 31, 2018, Defendant Wilcox received $558,352 in compensation from the Company, including a $136,952 salary and $421,400 in option awards.

30.     The Company's 2019 Proxy Statement stated the following about Defendant Wilcox:

**Gary Wilcox, Ph.D., Chairman and Chief Executive Officer**[6]

Dr. Wilcox has been a director of Cocrystal since January 2, 2014 and has served as the Chief Executive Officer since July 22, 2016. Dr. Wilcox has served as Chairman since February 1, 2019. From January 2, 2014 until March 11, 2015, Dr. Wilcox served as the Chairman of the Board (Co-Chairman beginning November 25, 2014) and Chief Executive Officer of Cocrystal. He is a co-founder of Cocrystal Discovery and served as its Chief Executive Officer from 2008 through March 2015. Since 2012, Dr. Wilcox has been a director of the Daily Journal Corporation (Nasdaq:DJCO), a publisher of legal newspapers and websites, and a developer of legal case management software. From 1993 to 2007, Dr. Wilcox served as Executive Vice President of Operations and a member of the Board of Directors of Icos Corporation (Nasdaq:ICOS), where he played a key role in the development of Cialis, a drug with annual sales of $2 billion. In 1982, Dr. Wilcox co-founded Ingene Inc. (Nasdaq:IGEI), serving as its Chairman, President and CEO through private financings, an IPO and a successful merger with XOMA Corporation (Nasdaq:XOMA) in 1989. From 1989-1993 Dr. Wilcox was Vice Chairman of the Board of Directors and Executive Vice President of Xoma. From 1974 until 1984, Dr. Wilcox was a Professor of Microbiology and a member of the Molecular Biology Institute at UCLA. He has served on 15 boards of directors including Nasdaq, New York and London stock exchange companies as well as private technology companies.

Dr. Wilcox's qualifications to serve on our Board include his 30 years of experience as an executive in biotechnology companies, his technical expertise in drug discovery and development, and his public company board of directors experience.

**Defendant Maza**

31.     Defendant Elliott Maza ("Maza") served as BioZone's interim CEO, CFO and Secretary starting from May 16, 2011. Defendant Maza was appointed BioZone's CEO on August 2, 2011 and served until his resignation on January 2, 2014 in connection with the Merger. He was a named defendant in the SEC Action, and he participated in the Pump & Dump Misconduct.

32.     Defendant Maza agreed to a settlement with the SEC on March 21, 2019 in relation on to the SEC Action. Judgment was entered against him on March 27, 2019, as discussed further below.

---

[6] Emphasis in original unless otherwise noted throughout.

**Defendant Meckler**

33.     Defendant Jeffrey Meckler ("Meckler") served as the Company's interim CEO from March 2015 to October 2015, and as CEO from October 2015 to July 2016. The Company's Schedule 14A filed with the SEC on June 27, 2016 (the "2016 Proxy Statement") stated the following about Defendant Meckler:

**Jeffrey Meckler, Chief Executive Officer and Director**

Mr. Meckler was appointed as a director in connection with the RFS Pharma Merger as of November 25, 2014.  Since March 31, 2015, Mr. Meckler has served as the Company's Chief Executive Officer.  Since 2009, Mr. Meckler has been the Managing Director of The Andra Group, a life sciences consulting firm. Since 2012, Mr. Meckler has served on the Board of Directors of QLT, Inc. (NASDAQ:QLTI), an ultra-orphan ophthalmic biotechnology company and since 2014, he has also served on the Board of Directors of Retrophin, Inc. (NASDAQ:RTRX), also an orphan biopharmaceutical company focused on the treatment of catastrophic diseases. Previously, from 2011 to 2012, Mr. Meckler acted as a Director and Interim CEO of Cypress Bioscience Inc. after its acquisition by Royalty Pharma. He also served as a Director of ClearFarma USA from 2010 to 2012, Kyalin Bioscience from 2011 to 2012 and Alveolus Inc. from 2007 to 2009. Mr. Meckler's qualifications to serve on our Board include his extensive experience in the biotechnology industry and his service on the boards of directors of Nasdaq issuers.

**Defendant Martin**

34.     Defendant James Martin ("Martin") served as the Company's interim CFO from February 2017 to June 2017, when he assumed the role of CFO.

35.     For the fiscal year ended December 31, 2018, Defendant Martin received $549,866 in compensation from the Company. This included $230,836 in salary and $316,050 in option awards.

36.     On September 21, 2018, after the SEC Action was filed, the Compensation Committee of the Board approved a grant of 150,000 incentive stock options to Defendant Martin.

37.    The Company's 2019 Proxy Statement stated the following about Defendant Martin:

**James J. Martin, Chief Financial Officer**

Mr. Martin has served as our Chief Financial Officer since June 1, 2017. Prior to that, from February 23, 2017 through May 30, 2017, Mr. Martin served as our Interim Chief Financial Officer. Mr. Martin has also served as Chief Financial Officer of Non-Invasive Monitoring Systems, Inc. (OTC:NIMU) since January 2011. From November 2016 to February 2017, Mr. Martin served as Chief Financial Officer of Motus GI Holdings, Inc., a privately held medical device company. From September 2014 to November 2016, Mr. Martin served as Chief Financial Officer of VBI Vaccines Inc. (formerly SciVac Therapeutics, Inc.) (Nasdaq:VBIV), a pharmaceutical development and manufacturing company. From April 2014 to September 2015, Mr. Martin served as Chief Financial Officer of Vapor Corp, Inc. (Nasdaq:VPCO), a vaporizer retail and wholesale company. From January 2011 to October 2013, Mr. Martin served as Chief Financial Officer of SafeStitch prior to its merger with TransEnterix, Inc (NYSE:TRXC).

**<u>Defendant Dale</u>**

38.    Defendant Curtis Dale ("Dale") served as the Company's CFO from November 2015 until January 2017.

39.    The Company's 2016 Proxy Statement stated the following about Defendant Dale:

**Curtis Dale, Controller and Interim Chief Financial Officer**

Since mid-November 2015, Mr. Dale has acted as Interim Chief Financial Officer. He joined Cocrystal in September 2015 and served as Controller of Cocrystal. From April 2014 through March 2015, he served as Director of Financial Planning and Analysis for Carestream Dental LLC. Prior to that, from August 2012 through April 2014, he served as Director of Accounting and Finance for Gabriel Brothers, Inc. From 2011 through August 2012, Mr. Dale was a financial consultant for both NCR and Ciba-Vision. He served as the Chief Financial Officer for MedLink Georgia, Inc. in 2010 and 2011 and from 2008 through 2010, he served as the Executive Director of Finance and Administration for Saint Joseph's Translational Research Institute. Mr. Dale served as Executive Finance Director for Stiefel Laboratories, for 2 years, as Corporate Controller for Solvay Pharmaceuticals for over 9 years, and various financial positions of increasing responsibility with Bristol-Myers Squibb.

**Defendant McGuire**

40.     Defendant Gerald McGuire ("McGuire") served as the Company's CFO and Treasurer from January 2014 to November 2015, having already served as Cocrystal Discovery's CFO before the merger since April 2012.

41.     According to the Company's Schedule 14A filed with the SEC on June 1, 2015 (the "2015 Proxy Statement"), Defendant McGuire received $150,000 in compensation for the fiscal year 2014, including $100,000 in salary and a $50,000 bonus.

42.     The Company's 2015 Proxy Statement stated the following about Defendant McGuire:

> Mr. McGuire has been Cocrystal's Chief Financial Officer and Treasurer since January 2, 2014 and has been Chief Financial Officer of Cocrystal Discovery since April 2012. Previously, Mr. McGuire served as a consulting Chief Financial Officer at Forte Design Systems, Inc., a provider of high-level synthesis software products and as a consulting Chief Financial Officer at Yapta, Inc., a travel technology company. From 2007 until August 2009, Mr. McGuire was an outsourced Chief Financial Officer at vCFO Holdings, Inc., a financial consulting business.

**Defendant Keller**

43.     Defendant Brian Keller ("Keller") was the Chief Scientific Officer of BioZone and a member of BioZone's Board of Directors. He resigned from BioZone in connection with the Merger. He was a named defendant in the SEC Action, and he participated in the Pump & Dump Misconduct.

44.     Defendant Keller agreed to a settlement with the SEC on March 26, 2019 in relation on  to the SEC Action. Judgment was entered against him on March 29, 2019, as discussed further below.

**Defendant Block**

45.     Defendant David Block ("Block") served as a Company director from November 2014 until his resignation on January 4, 2019.

46.     According to the 2019 Proxy Statement, Defendant Block received $105,350 in compensation for his services as a director for the fiscal year 2018. This compensation was composed entirely of option awards.

47.     The Company's Schedule 14A filed with the SEC on June 25, 2018 (the "2018 Proxy Statement") stated the following about Defendant Block:

**David Block, M.D., M.B.A., Director**

Dr. Block was appointed a director as of November 25, 2014. Since May 2007, Dr. Block has served as President, Chief Executive Officer and Chairman of the Board of Gliknik Inc., a biopharmaceutical company which he founded to create new therapies for people living with cancer and immune disorders. From 1990 through its successful sale in 2002, Dr. Block held a number of commercial positions at DuPont Merck and DuPont Pharmaceuticals, ultimately as EVP of International Operations. He was subsequently COO of Celera Genomics and CEO of venture-funded Ruxton Pharmaceuticals prior to founding Gliknik. Dr. Block has been an active HIV physician at Johns Hopkins since 1992.
Dr. Block's qualifications to serve on our Board include his expertise in pharmaceutical development strategy and commercialization, finance and budgeting, and operational management, and his knowledge of medicine and unmet medical needs.

**Defendant Frost**

48.     Defendant Frost has served as a Company director since 2014, and he served as a director of Cocrystal Discovery Inc. prior to the Merger. He was a named defendant in the SEC Action, and he participated in the Pump & Dump Misconduct.

49.     Defendant Frost and two of his companies, Opko and FGIT, agreed to a settlement with the SEC on December 27, 2018 in relation on  to the SEC Action. Judgment was entered against them on January 10, 2019, as discussed further below.

50.     According to the 2019 Proxy Statement, as of April 24, 2019, Defendant Frost beneficially owned 3,664,014 shares of the Company's common stock, which represented 11.6% of outstanding shares on that date.[7] Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $2.55, Frost owned over $9.3 million worth of Cocrystal common stock.

51.     According to the 2019 Proxy Statement, Defendant Frost received $105,350 in compensation for his services as a director for the fiscal year 2018. This compensation was composed entirely of option awards.

52.     Between October 1, 2013 and October 14, 2013, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Frost sold 1,987,991 shares of the Company's stock for proceeds of approximately of $1.1 million.

53.     The Company's 2019 Proxy Statement stated the following about Defendant Frost:

**Phillip Frost, M.D., Director**

Dr. Frost has been a director of Cocrystal since January 2, 2014 and has been a director of Cocrystal Discovery since 2008. He has served as CEO and Chairman of OPKO Health Inc. (Nasdaq:OPKO) ("OPKO"), a multi-national pharmaceutical and diagnostics company since March 2007. Dr. Frost was named Chairman of the Board of Ladenburg Thalmann Financial Services Inc. ("Ladenburg Thalmann") (NYSE American:LTS), an investment banking, asset management, and securities brokerage firm providing services through its principal operating subsidiary, Ladenburg Thalmann & Co. Inc., in July 2006 and has been a director of Ladenburg

---

[7] Includes 3,655,265 shares of common stock held by Frost Gamma Investments Trust and 8,749 vested options. Defendant Frost is the trustee of Frost Gamma Investments Trust. Frost Gamma L.P. is the sole and exclusive beneficiary of Frost Gamma Investments Trust. Defendant Frost is one of two limited partners of Frost Gamma L.P. The general partner of Frost Gamma L.P. is Frost Gamma, Inc., and the sole shareholder of Frost Gamma, Inc. is Frost-Nevada Corporation. Defendant Frost is the sole shareholder of Frost-Nevada Corporation. Does not include securities held by Opko, a corporation of which Defendant Frost is the Chief Executive Officer and Chairman, concerning the securities of which Defendant Frost does not hold voting and investment control. Defendant Frost disclaims beneficial ownership of the securities held by Frost Gamma Investments Trust and Opko except to the extent of any pecuniary interest therein.

Thalmann from 2001 until 2002 and again since 2004. Dr. Frost also serves as a director for Castle Brands (NYSE American:ROX), a developer and marketer of premium brand spirits. He serves as a member of the Board of Trustees of the University of Miami, the Skolkovo Foundation Scientific Advisory Council in Russia, the Shanghai Institute for Advanced Immunochemical Studies in China, and The Florida Council of 100 and as a Trustee of each of the Miami Jewish Home for the Aged and the Mount Sinai Medical Center. He serves as Chairman of Temple Emanu-El, Governor of Tel Aviv University and is a member of the Executive Committee of The Phillip and Patricia Frost Museum of Science. Dr. Frost served as a director of Teva Pharmaceutical Industries, Limited, or Teva (NYSE:TEVA) from January 2006 until February 2015 and had served as Chairman of the Board of Teva from March 2010 until December 2014 and as Vice Chairman from January 2006 until March 2010. Dr. Frost previously served as Vice Chairman of Cogint, Inc., and as a director for Sevion Therapeutics, Inc. prior to its merger with Eloxx Pharmaceuticals, Inc., SafeStitch Medical Inc. prior to its merger with TransEnterix, Inc., and PROLOR Biotech, Inc. prior to its acquisition by OPKO in August 2013, and as Governor and Co-Vice Chairman of the American Stock Exchange (now NYSE American).

Dr. Frost had served as Chairman of the Board of Directors and Chief Executive Officer of IVAX Corporation ("IVAX") from 1987 until its acquisition by Teva in January 2006. Dr. Frost was Chairman of the Board of Directors of Key Pharmaceuticals, Inc. from 1972 until the acquisition of Key Pharmaceuticals, Inc. by Schering Plough Corporation in 1986.

Dr. Frost has successfully founded several pharmaceutical companies and overseen the development and commercialization of a multitude of pharmaceutical products. This combined with his experience as a physician and chairman and/or chief executive officer of large pharmaceutical companies has given him insight into virtually every facet of the pharmaceutical business and drug development and commercialization process. He is a demonstrated leader with keen business understanding and is uniquely positioned to help guide our Company.

**Defendant Hsiao**

54.      Defendant Dr. Jane H. Hsiao ("Hsiao") has served as a Company director since 2014, and served as a director of Cocrystal Discovery Inc. prior to the Merger. According to the 2019 Proxy Statement, as of April 24, 2019, Defendant Hsiao beneficially owned 306,479 shares of the Company's common stock, which represented 1.0% of outstanding shares on that date.[8]

---

[8] Includes (i) 114,509 shares of common stock held directly by Defendant Hsiao, (ii) 183,221 shares of common stock held by Hsu Gamma Investment, L.P, for which Defendant Hsiao serves as General Partner, and (iii) 8,749 vested options.

Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $2.55, Hsiao owned approximately $781,521 worth of Cocrystal stock.

55.     According to the 2019 Proxy Statement, Defendant Hsiao received $105,350 in compensation for her services as a director for the fiscal year 2018. This compensation was composed entirely of option awards.

56.     The Company's 2019 Proxy Statement stated the following about Defendant Hsiao:

**Jane H. Hsiao, Ph.D., M.B.A., Director**

Dr. Hsiao has been a director of Cocrystal since January 2, 2014 and has been a director of Cocrystal Discovery since 2008. She has served as Vice-Chairman and Chief Technical Officer of OPKO since May 2007 and as a director since February 2007. Dr. Hsiao has served as Chairman of the Board of Non-Invasive Monitoring Systems, Inc. (OTC:NIMU), a medical device company, since October 2008 and was named Interim Chief Executive Officer of Non-Invasive Monitoring Systems, Inc. in February 2012. Dr. Hsiao is also a director of each of TransEnterix, Inc. (NYSE American:TRXC), a medical device company, Neovasc, Inc. (NasdaqCM: NVCN), a company developing and marketing medical specialty vascular devices. Dr. Hsiao previously served as a director for PROLOR Biotech, Inc. prior to its acquisition by OPKO in August 2013, and as Chairman of the Board of SafeStitch Medical, Inc. prior to its merger with TransEnterix, Inc. Dr. Hsiao served as the Vice Chairman-Technical Affairs of IVAX from 1995 to January 2006. Dr. Hsiao served as Chairman, Chief Executive Officer and President of IVAX Animal Health, IVAX's veterinary products subsidiary, from 1998 to 2006.
Dr. Hsiao's qualifications to serve on our Board of Directors include her background in pharmaceutical chemistry and strong technical expertise, as well as her senior management experience at OPKO and IVAX. In addition, as a result of her role as director and/or chairman of other companies in the biotechnology and life sciences space, she has a keen understanding and appreciation of the many regulatory and development issues confronting pharmaceutical and biotechnology companies.

**Defendant Rubin**

57.     Defendant Steven D. Rubin ("Rubin") has served as a Company director since 2014, and served as a director of Cocrystal Discovery Inc. prior to the Merger. According to the 2019 Proxy Statement, as of April 24, 2019 Defendant Rubin beneficially owned 32,197 shares of

the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $2.55, Rubin owned approximately $82,102 worth of Cocrystal stock.

58.     According to the 2019 Proxy Statement, Defendant Rubin received $105,350 in compensation for his services as a director for the fiscal year 2018. This compensation was composed entirely of option awards.

59.     The Company's 2019 Proxy Statement stated the following about Defendant Rubin:

**Steven D. Rubin, Director**

Mr. Rubin has been a director of Cocrystal since January 2, 2014 and a director of Cocrystal Discovery since 2008. Mr. Rubin has been the Executive Vice President of OPKO, since May 2007 and a director of OPKO since February 2007. Mr. Rubin is a member of The Frost Group, LLC, a private investment firm. In addition to OPKO, Mr. Rubin currently serves as Chairman of Neovasc, Inc. (NasdaqCM: NVCN), a developer of vascular devices, and is on the Boards of Directors of Non-Invasive Monitoring Systems, Inc. (OTC:NIMU), a medical device company, Kidville, Inc. (OTC:KVIL), which operates upscale learning and play facilities for children, Eloxx Pharmaceuticals, Inc. (NasdaqGM:ELOX), a clinical-stage biopharmaceutical company developing novel RNA-modulating drug candidates that are designed to treat rare and ultra-rare premature stop codon diseases, Castle Brands, Inc. (NYSE MKT:ROX), a marketer of premium spirits, Red Violet (NasdaqCM:RDVT), a software services company spun off from Cogint, Inc., and Chromadex Corp., an integrated, global nutraceutical company devoted to improving the way people age. Mr. Rubin previously served as a director of Cogint, Inc. (NasdaqGM:COGT), an information solutions provider focused on the data-fusion market, prior to the spin-off of its data and analytics operations and assets into Red Violet, Inc., Sevion Therapeutics, Inc., prior to its merger with Eloxx Pharmaceuticals, Inc., Dreams, Inc. (NYSE American:DRJ), a vertically integrated sports licensing and products company, Safestitch Medical, Inc. prior to its merger with TransEnterix, Inc., SciVac Therapeutics, Inc. prior to its merger with VBI Vaccines, Inc., Tiger X Medical, Inc. prior to its merger with BioCardia, Inc., and PROLOR Biotech, Inc., prior to its acquisition by OPKO in August 2013. Mr. Rubin also served as the Senior Vice President, General Counsel and Secretary of IVAX from August 2001 until September 2006.
Mr. Rubin's qualifications to serve on our Board include extensive leadership, business, and legal experience, as well as tremendous knowledge of our business and the pharmaceutical industry generally. He has advised pharmaceutical

---

[9] Includes 23,448 shares of common stock and 8,749 vested options.

companies in several aspects of business, regulatory, transactional, and legal affairs for more than 24 years. His experience as a practicing lawyer, general counsel, and board member to multiple public companies, including several pharmaceutical and life sciences companies, has given him broad understanding and expertise, particularly relating to strategic planning and acquisitions.

**Defendant Schinazi**

60.     Defendant Dr. Raymond Schinazi ("Schinazi") served as a Company director and Chairman of the Board from November 2014 until his resignation on February 1, 2019.[10] According to the 2019 Proxy Statement, as of April 24, 2019, Defendant Schinazi beneficially owned 10,361,985 shares of the Company's common stock, which represented 32.6% of outstanding shares on that date.[11] Given that the price per share of the Company's common stock at the close of trading on April 24, 2019 was $2.55, Schinazi owned over $26.4 million worth of Cocrystal stock.

61.     According to the 2019 Proxy Statement, Defendant Schinazi received $105,350 in compensation for his services as a director for the fiscal year 2018. This compensation was composed entirely of option awards.

62.     The Company's 2018 Proxy Statement stated the following about Defendant Schinazi:

**Raymond Schinazi, Ph.D., Hon D.Sc., Chairman**

Dr. Schinazi was appointed Co-Chairman of the Board as of November 25, 2014. Since March 11, 2015, Dr. Schinazi has served as Chairman of the Board. Dr. Schinazi was the founder of RFS Pharma in 2004, prior to the merger with the Company in 2014. Dr. Schinazi has been at Emory University since 1978 and currently serves as the Frances Winship Walters Professor of Pediatrics and Director of the Laboratory of Biochemical Pharmacology at Emory University. He is also the Director of the Scientific Working Group on Viral Eradication for the NIH-sponsored Emory University Center for AIDS Research (CFAR). In addition,

---

[10] From November 2014 to March 2015, Defendant Schinazi was the Co-Chairman of the Board.
[11] Includes 995,593 shares of common stock held by an entity controlled by Defendant Schinazi and 125,464 vested options.

Dr. Schinazi currently serves as a Governing Trustee for the Foundation for AIDS Research (amfAR), the International Center for Missing & Exploited Children (ICMEC), and the Global Virus Network (GVN) and serves as a non-executive Director of Gliknik Inc. Dr. Schinazi has been a director of ReViral Ltd since April 2014, and a director of Brace Pharma Capital, LLC since February 2014.

Dr. Schinazi's qualifications to serve on our Board include being the founder of multiple successful biotechnology companies including Triangle Pharmaceuticals, Inc., Pharmasset, Inc. and Idenix Pharmaceuticals, Inc. and his extensive experience and his technical expertise in drug discovery and development.

**Defendant Brauser**

63.     Defendant Brauser was a shareholder of BioZone. He is a named defendant in the SEC Action, and he participated in the Pump & Dump Misconduct.

64.     Defendant Brauser in addition to owning BioZone stock, also owned one third of Southern Biotech, Inc. ("Southern Biotech"), whose one-third owner and President was Defendant Honig.

65.     Between September 27, 2013 and December 23, 2013, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Brauser and his investment vehicle, Grander Holdings, Inc. ("Grander") sold 2,128,316 shares of the Company's stock for proceeds of over $1.1 million.

**Defendant Groussman**

66.     Defendant Groussman was a shareholder of BioZone. He was a named defendant in the SEC Action, and he participated in the Pump & Dump Misconduct. Defendant Groussman and his investment vehicle, Melechdavid, Inc. ("Melechdavid") entered into a settlement with the SEC on January 16, 2019 in relation on  to the SEC Action. Judgment was entered against them on February 2, 2019, as discussed further below.

67.     Between September 26, 2013 and October 14, 2013, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme

was exposed, Defendant Groussman and Melechdavid sold 1,229,166 shares of the Company's stock for proceeds of approximately $677,272.

**Defendant Honig**

68.     Defendant Honig was a shareholder of BioZone. He was a named defendant in the SEC Action, and he participated in the Pump & Dump Misconduct.

69.     Defendant Honig has been characterized as a serial stock promoter, and he has been linked to a number of other 'pump-and-dump' schemes where he is accused of falsely inflating stock prices.

70.     Defendant Honig was the one-third owner and President of Southern Biotech, a private company specializing in the production of antibodies. Defendants Brauser and Frost are the other co-owners of Southern Biotech. In 2018, he also owned a majority stake in HS Contrarian Investments LLC ("HS Contrarian"), a private investment firm founded and managed by Defendant Stetson in 2011.

71.     Between September 23, 2013 and December 16, 2013, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Honig sold 5,892,689 shares of the Company's stock for proceeds in excess of $3.4 million.

72.     Defendant Honig and his investment vehicle, GRQ Consultants ("GRQ"), entered into a settlement with the SEC on June 17, 2019 in relation to the SEC Action, and judgment was entered against him on July 10, 2019, as discussed further below.

**Defendant O'Rourke**

73.     Defendant O'Rourke was a shareholder of BioZone. He is a named defendant in the SEC Action, and participated in the Pump & Dump Misconduct.

74.     Between September 23, 2013 and December 27, 2013, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant O'Rourke and his investment vehicle, ATG Capital LLC ("ATG"), sold 250,000 shares of the Company's stock for proceeds of approximately $148,444.

**Defendant Stetson**

75.     Defendant Stetson was a shareholder of BioZone. He is a named defendant in the SEC Action, and participated in the Pump & Dump Misconduct.

76.     Between September 23, 2013 and December 18, 2013, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Stetson and an entity associated with Defendant Stetson (Stetson Capital Investments) sold 500,000 shares of the Company's stock for proceeds of approximately $249,860.

77.     Defendant Stetson, with Defendant Honig, also co-owns HS Contrarian, which Stetson founded and of which he is the managing partner. HS Contrarian is also a defendant in the SEC Action.

**Defendant Ford**

78.     Defendant Ford was a shareholder of BioZone. He often wrote investment articles, most notably on the *Seeking Alpha* website.

79.     Defendant Ford was a named defendant in the SEC Action, and he participated in the Pump & Dump Misconduct. Defendant Ford entered into a settlement with the SEC in relation to the SEC Action, and judgment was entered against him on September 21, 2018, as discussed further below.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

80.     By reason of their positions as controlling shareholders, officers, directors, and fiduciaries of Cocrystal, and because of their ability to control the business and corporate affairs of Cocrystal, the Individual Defendants owed Cocrystal and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cocrystal in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cocrystal and its shareholders so as to benefit all shareholders equally.

81.     Each controlling shareholder, director and officer of the Company owes to Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Cocrystal, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

83.     To discharge their duties, the controlling shareholders, officers and directors of Cocrystal were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers or

controlling shareholders of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Cocrystal's Board at all relevant times.

85.     As senior executive officers, directors, or controlling shareholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ and OTC (at relevant times), the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

86.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cocrystal were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Cocrystal's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Cocrystal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Cocrystal and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cocrystal's operations would comply with all applicable laws and Cocrystal's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87.     Each of the Individual Defendants further owed to Cocrystal and the shareholders the duty of loyalty requiring that each favor Cocrystal's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

88.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Cocrystal and were at all times acting within the course and scope of such agency.

89.     Because of their advisory, executive, managerial, and directorial positions with the Company, or status as controlling shareholders, each of the Individual Defendants had access to adverse, non-public information about the Company.

90.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

91.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

92.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, and

the Outside Individual Defendants' aiding and abetting thereof; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; (iii) to engage in the Pump & Dump Misconduct; and (iv) to artificially inflate the Company's stock price while three of the Individual Defendants and three of the Outside Individual Defendants engaged in lucrative insider sales.

93.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Cocrystal was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

94.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

95.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

## COCRYSTAL'S CODE OF BUSINESS CONDUCT AND ETHICS

96.    Cocrystal's Code of Business Conduct and Ethics (the "Code of Ethics") "governs the work behavior and business relationships of the Company's directors, officers and employees with customers, competitors, governmental officials, the media, vendors, communities, the general public and each other."

97.    The Code of Ethics further provides that "[a]ll the Company's directors, officers and employees are covered by the Code."

98.    Regarding ethical compliance, the Code of Ethics provides that:

The reputation of Cocrystal Pharma, Inc. (the "Company") is built upon basic principles of ethical behavior, individual integrity and personal commitment. This reputation can be retained only if all the Company's employees establish and adhere to the highest moral and ethical standards in the conduct of the Company's business.

99.    The Code of Ethics provides, regarding "Standards of Conduct," that "infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment, without prior warning or progressive discipline" include, *inter alia*, the "[f]alsification of Company records."

100.    The Code of Ethics provides that insider trading is illegal and unethical, stating, in relevant part:

***Federal and state securities laws prohibit the purchase or sale of a company's securities by persons who are aware of material information about that company that is not generally known or available to the public.*** These laws also prohibit persons who are aware of such material nonpublic information from disclosing this information to others who may trade. Companies and their controlling persons are also subject to liability if they fail to take reasonable steps to prevent insider trading by company personnel.

* * *

This Policy is designed to prevent insider trading or allegations of insider trading and protect our reputation for integrity and ethical conduct. It is your obligation to understand and comply with this Policy. Should you have any questions regarding this Policy, please contact our General Counsel.

(Emphasis added.)

101. The Code of Ethics goes on, under the Company's "Basic Policy" regarding insider trading, to state that:

> ***No director, officer, employee, consultant or agent*** (or their family members and members of their household) ***of Cocrystal and its subsidiaries or affiliates may trade on the basis of material nonpublic information or engage in any other action to take advantage of, or pass on to others, that information***. To avoid even the appearance of impropriety, additional restrictions on trading our securities apply to our directors, executive officers and certain other persons identified by us from time to time and who have been notified that they have been so identified...

(Emphasis added.)

102. The Code of Ethics provides, with respect to the scope of the Company's insider trading policy, that:

> ***Persons.*** <u>This Policy applies to directors, officers, employees, consultants and agents of Cocrystal and its subsidiaries and affiliates.</u> The same restrictions that apply to you apply to your family members who reside with you, anyone else who lives in your household and any family members who do not live in your household but whose transactions in our securities are directed by you or are subject to your influence or control (such as parents or children who consult with you before they trade in securities). You are responsible for making sure that the purchase or sale of any security covered by this Policy by any such person complies with this Policy.
>
> ***Companies.*** <u>The prohibition on insider trading in this Policy is not limited to trading in our securities. It includes trading in the securities of other firms</u>, such as our customers or suppliers and those with which we may be negotiating major transactions, such as an acquisition, investment or sale. Information that is not material to Cocrystal may nevertheless be material to one of those other firms.

(Bold and italic emphasis in original, underlined emphasis added.)

103. Regarding "Restrictions on Purchases, Sales and Tipping," the Code of Ethics provides, in relevant part:

> ***Trading on Inside Information.*** You may not trade in our securities, directly or indirectly (through family members or other persons or entities), if you are aware of material nonpublic information relating to Cocrystal. Similarly, you may not trade in the securities of any other company, directly or indirectly, if you are aware of material nonpublic information about that company which you obtained in the course of your relationship with Cocrystal.

104.    The Code of Ethics lists several potential consequences for failure to comply with its provisions, including:

> ***Civil and Criminal Penalties.*** Potential penalties for insider trading violations include imprisonment for up to 20 years, criminal fines of up to $5 million and civil fines of disgorgement, or return, of profit gained or loss avoided, plus a fine of up to three times the profit gained or loss avoided.

> ***Controlling Person Liability.*** If we fail to take appropriate steps to prevent illegal insider trading, we may have "controlling person" liability for a trading violation and be subject to civil penalties of up to the greater of $1 million and three times the profit gained or loss avoided as well as a criminal penalty of up to $25 million. The civil penalties can extend personal liability to our directors, officers and other supervisory personnel if they fail to take appropriate steps to prevent insider trading.

> ***Cocrystal Sanctions.*** Failure to comply with this Policy may also subject you to sanctions imposed by Cocrystal, including dismissal for cause, whether or not your failure to comply with this Policy results in a violation of law.

> ***Assistance.*** Your compliance with this Policy is of the utmost importance both for you and Cocrystal. If you have any questions about this Policy or its application to any proposed transaction, you may obtain additional guidance from our General Counsel. Do not try to resolve uncertainties on your own, as the rules relating to insider trading are often complex, not always intuitive and carry severe consequences.

105.    The Code of Ethics states that the Company's Ethics Hotline Policy exists to foster honesty without fear of retaliation, and it remains in place to ensure that Cocrystal itself is as honest as possible in its disclosures, stating that:

> Cocrystal is committed to the highest possible standards of ethical, moral and legal business conduct. In conjunction with this commitment and Cocrystal's commitment to open communication, this policy aims to provide an avenue for employees to raise concerns and reassurance that they will be protected from reprisals or victimization for whistleblowing in good faith. However, if an employee feels that their anonymity is not required then they should follow our existing grievance procedure.

> ***POLICY***
> The whistleblowing policy is intended to cover serious concerns that could have a large impact on Cocrystal, such as actions that:
> • May lead to incorrect financial reporting;
> • Are unlawful;

• Are not in line with company policy, including the Code of Business Conduct; or
• Otherwise amount to serious improper conduct. Regular business matters that that
do not require anonymity should be directed to the employee's supervisor and are
not addressed by this policy.

106. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets and violations of the Exchange Act. Three of the Individual Defendants violated the Code of Ethics by selling Company shares while in possession of material, non-public information about the Company, despite their status as members of a group of controlling shareholders or agents of the Company. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to uphold standards of ethical behavior, individual integrity and personal commitment, or adhere to the highest moral and ethical standards.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

107. During the Relevant Period, Defendant Frost coordinated with the other Frost Conspirators and Defendants Maza and Keller to perpetrate the Pump & Dump Misconduct.

108. The SEC Action alleges that the entity referred to in the SEC Action as "Company A" is a Delaware Corporation headquartered in Georgia.

109. It further alleges that Company A was controlled by Defendants Honig, Frost, and Brauser between March 2011 and December 2013, and engaged in a reverse merger in 2014. The SEC Action alleges that Defendants Maza and Keller were the CEO and CSO and directors of Company A, respectively.

110.     Thus, upon information and belief, BioZone is the Company identified as Company A in the SEC Action.

**The Frost Conspirators Tee Up the Company for the Pump & Dump**

111.     Defendants Honig, Stetson and Groussman purchased one-third of a publicly-traded shell company, International Surf Resorts, Inc. ("ISR"), in November 2010. The following month, December 2010, Defendants Frost and Brauser each purchased one of the remaining thirds of ISR. Defendants Brauser, Frost, Groussman, Honig, and Stetson disguised these purchases by operating through an intermediary entity.

112.     Following the acquisition of ISR's shares by Defendants Honig, Stetson, Groussman, Frost, and Brauser, an associate of Defendant Frost (Roberto Prego-Novo) was appointed as ISR's sole director.

113.     Defendants Brauser, Frost and Honig approached certain members of then-private BioZone's management in late 2010 with a proposal for taking it public: a reverse merger, through which BioZone would be merged into ISR.  Despite making representations that they would invest money in and raise $8 million to $15 million for BioZone's research and development (especially for its proprietary "QuSomes" technology), Defendants Honig, Brauser, and Frost failed to do so. Instead, they limited their investments to keeping the Company running at the most basic levels and funding handsome executive compensation for Defendants Maza and Keller, as well as one BioZone researcher. Each of these three individuals were promised 6.65 million shares in exchange for approving the merger.

114.     In January of 2011, BioZone received a binding letter of intent declaring that private equity firm The Frost Group, which included Defendants Brauser, Frost, and Honig, would

invest in BioZone's research and development department. The letterhead indicated that it had been sent by the "Honig, Brauser, Frost Group."

115.    BioZone's then-CEO, Daniel Fisher, would go on to file a whistleblower complaint with the SEC in December 2011. After Defendant Maza fired him in January 2012, Fisher then initiated his own lawsuit in the Northern District of California (the "Fisher Lawsuit") against Cocrystal and, *inter alia*, Defendants Brauser, Frost, Honig, Keller, and Maza, in July 2012.[12]

116.    According to Fisher, Defendant Frost had "insisted" that Defendant Maza act as BioZone's attorney during the reverse merger, which was initiated by a securities purchase agreement on February 28, 2011. Concurrently, ISR (at the direction of Defendants Brauser, Honig, and Frost) bought up unsuccessful Frost assets using BioZone stock.

117.    Thus, Defendants Frost, Honig, and Brauser caused the Company to engage in a series of PIPE (private investment in public equity) financings between March 2011 and June 2012, through which Defendants Honig, Brauser, and Frost acquired more low-priced shares of Company stock. However, these financings did nothing to enhance the Company's continued growth. Indeed, the Company was forced to abandon research and development efforts by mid-2012.

118.    In March 2011, a bank that had previously issued BioZone a $3 million line of credit denied $2 million in bridge financing necessary for the reverse merger. In exercising its prerogative to decline the transaction, the bank stated that the Merger "creates enormous conflicts of interest. There is substantial reason to believe that the resulting entity would act for the benefit of the [group of investors] as a whole, rather than the interests of [Biozone]." When BioZone went

---

[12] *See* Fisher v. BioZone Pharm., Inc., No. 12-cv-3716, 2013 WL 12144120, at *1-4 (N.D. Cal.). Fisher pled twelve claims ranging from tortious interference with contract to Dodd-Frank and RICO (Racketeering Influenced and Corrupt Organizations) Act violations.

ahead with the Merger, the bank gave notice that BioZone's balance on its credit line was immediately due and payable.

119.    After the Merger, which closed in June 2011, Defendant Maza was appointed as CEO, CFO, and a director, with Defendant Keller also promoted to a Company director. ISR's name was changed to BioZone, with the Company operating at the direction of Defendants Honig and Brauser. Defendant Keller was soon installed as President and Chief Science Officer of the new BioZone.

120.    As CEO, the SEC stated that "Maza sought approval from Honig, Brauser, and sometimes [Frost] for material business decisions." In one such case, Defendant Maza even "agreed to divert funds from [BioZone] to pay rent for the office of an unrelated entity" that was located where Frost-owned Opko maintained its offices, in the same building as various other businesses controlled by Defendants Frost and Honig. Defendant Maza also borrowed large sums from Defendant Frost—via high-interest short-term convertible debt—in  order to pay off BioZone's line of credit to the bank that had attempted to block the Merger.

121.    With knowledge that Defendants Brauser and Honig controlled BioZone with Defendant Frost's knowledge and consent, Defendants Keller and Maza and non-Defendant Prego-Novo signed off on false and misleading public filings made by BioZone that concealed Defendants Brauser's and Honig's control of BioZone though non-disclosure of Defendants Honig, Stetson, Brauser or Grossman's involvement in BioZone. In those filings, Defendant Frost alone was disclosed as a control person out of the entire controlling group.

122.    This control, and Defendants Maza and Keller's knowledge thereof, is demonstrated by Defendant Keller's February 12, 2012 email, quoted in the SEC Action, stating "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece."

According to the SEC, Defendant Maza "sent Honig, Brauser, and [Frost] updates at least every month providing details on business operations and business opportunities, as well as seeking their approval for material business decisions." For example, on February 28, 2013 Defendant Maza sent Defendant Brauser an email seeking his approval for two lender proposals to which Hornig and Frost had already agreed, writing "[Frost] is OK if you're OK with it. Work for u?"

123.    This control is further evidenced by the complaint filed in the Pro Se Action, which alleged that Defendant Maza caused the Company to transfer BioZone assets to Opko for inadequate consideration, against BioZone's business interests,  prior to the beginning of the Relevant Period.

124.    Defendant Keller's compensation more than doubled after he began working with the Frost Conspirators, ranging between $300,000 and $600,000 per year. Defendant Maza's compensation doubled just from 2011 to 2013.

125.    Defendants Frost's, Honig's and Brauser's involvement in the Company's operations is evidenced by Defendant Brauser's involvement in settling the Fisher Lawsuit. According to the SEC Action, Defendant Brauser (neither an officer nor a director at BioZone) took the lead in negotiating a settlement on behalf of BioZone and providing frequent updates to Defendants Honig and Frost. Ultimately, after their motion to dismiss was denied, Defendants Brauser and Honig agreed to pay Fisher $2 million to relinquish claims to the millions of shares he had been promised in the Merger, but never received. On September 5, 2013, Defendant Maza ratified the terms of that settlement deal.

126.    Pursuant to an agreement to obtain, retain, or dispose of their shares in concert, Defendants Honig, Frost, Brauser, Maza, and Keller, in combination with Prego-Novo, had

amassed over 44.8 million BioZone shares by April 1, 2013, representing nearly 71% of BioZone's outstanding common stock as of that date.

127.    Despite these combined shareholdings of a coordinated group and the existence of an agreement, the aggregated shareholdings thereof were not disclosed in BioZone's periodic filings.

128.    To acquire even more BioZone stock at below-market prices, the Frost Conspirators caused the Company to enter into a securities purchase agreement with MusclePharm on August 26, 2013, a fact disclosed in the Company's Form 8-K filed four days later. The deal, which clearly operated to MusclePharm's advantage, entailed a $2 million investment by MusclePharm into BioZone, for which MusclePharm received a 10% secured note convertible. This note could be converted into extremely cheap BioZone shares (at only $0.20 each), as well as a 10-year warrant granting the right to purchase 10 million more shares at $0.40, still well below fair market price. Defendant Frost, who was a significant investor in MusclePharm, took advantage of these grants and warrants, amassing even more cheap shares of BioZone.

129.    Between August and September of 2013, Defendant Stetson deposited nearly 4 million shares of BioZone common stock that had been issued to Defendant Honig into a brokerage account, at Defendant Honig's direction. When depositing the shares, Defendant Stetson falsely denied that any relationship existed between BioZone, it affiliates, or Defendant Honig. Defendant Stetson further aided in securing the issuance of false attorney opinion letters to BioZone's transfer agent stating that Defendant Honig was not an affiliate of BioZone, to remove restrictive legends from Defendant Honig's share certificates. Defendant Stetson knew, or was reckless in not knowing, that Defendant Honig was an affiliate of BioZone at the time that he made these representations.

130.    Defendant Maza issued a letter to confirm the authenticity of Defendant Honig's stock certificates on September 10, 2013. The letter asserted that "there is no other agreement or understanding between Barry Honig and [BioZone] that would preclude Barry Honig from selling or otherwise disposing of the shares represented above." This statement was false and misleading because Defendant Honig was an affiliate of BioZone, and therefore, under the federal securities laws, his shares were subject to volume limitations.

131.    The restrictions on Defendant Honig's shares had been removed, and the shares deposited into a brokerage account, on or before September 2013.

**The Pump & Dump is Executed**

132.    In mid-September 2013, according to the SEC, there was little to no trading volume and "the market… was nonexistent (with zero volume on September 20, 2013)" for BioZone securities.

133.    Beginning on September 23, 2013, Defendant Honig and various associates of his engaged in trading of BioZone stock for the purpose of creating the appearance of market activity and interest in BioZone, causing the trading volume of BioZone shares to spike from zero shares on September 20, 2013 to 302,000 shares on September 23, 2013, the following trading day.

134.    Entities controlled by Defendants Groussman and Honig made similar coordinated trades, also at $0.68 per share, near the end of the trading day on September 26, 2013, further creating the false appearance of market interest in BioZone stock.

135.    Defendant O'Rourke, through an entity he owned, placed an order to buy BioZone shares for $0.68 at 3:58 PM on September 23, 2013. This was significantly higher than the last buy order at $0.55, which had been entered less than an hour prior. An associate of Defendant Honig sold shares at that price, thus increasing the closing price of BioZone shares.

136.    During September 2013 Defendants Honig and O'Rourke, both of whom would later be implicated in a 2017 pump-and-dump with Riot Blockchain (O'Rourke's company), began corresponding about Defendant Ford, a stock promoter with whom Honig had a prior relationship. At Defendant Honig's request, O'Rourke contacted Ford and brought him into the scheme, commissioning him to write an article for *Seeking Alpha* praising BioZone to artificially inflate share prices.

137.    Just before market close on September 26, 2013, Defendant Ford published an article on the *Seeking Alpha* website titled "Opko And Its Billionaire CEO Invested In Biozone" (the "Ford Article"). The article highlighted Defendant Frost and Cocrystal's BioZone holdings to promote and inflate the price of BioZone securities in light of Frost's reputation as a billionaire and successful biotech investor. The article stated, in relevant part:

> I recently established a position in BioZone Pharmaceuticals (BZNE.OB) based on the company's undervaluation, its patented QuSomes technology, and the fact that Opko... and Dr. Phillip Frost have taken a 25% position in BioZone. (All of my Dr. Frost investments have provided large returns.) BioZone's strong patent portfolio, multibillion-dollar addressable markets, and current revenue stream, make it an ideal asymmetrical trade, with large upside potential, and limited downside risk.

138.    The Ford Article leaned heavily on Defendant Frost's track record as a supposedly shrewd investor, stating that:

> Dr. Phillip Frost and his company, Opko, have purchased 17.68 million shares of BioZone stock (about 25% of the company). In my opinion they would not have taken such a large position unless BioZone's QuSomes technology was solid. I feel confident in my due diligence, but Dr. Frost and his scientific team are capable of a much higher level of scientific analysis than I could ever conduct. His large position in BioZone is a strong validation of the company's technology…
> With Opko and Dr. Frost's investment in the company, I assume Dr. Frost is offering his experience and expertise in guiding the company's development. Given his track record, this can only benefit shareholders and is one of the primary reasons I invested in BioZone.

139.    Defendant Keller, who gave a question-and-answer style interview for the article, examined the article before it was published. Keller's interview focused on BioZone's QuSomes technology, including its market and scientific potential and its role in BioZone's future growth. Among the many misleading statements were the assertion that BioZone "ha[s] already developed a formulation" for one injectable drug, which was purportedly already at the testing stage, with another antifungal injectable formula in development. Not only were such technologies adamantly not in production, but BioZone's research and development division had already been shut down, and this project left abandoned, over a year before the interview.

140.    Defendant Ford flatly lied about his compensation for the article, writing that he "wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article." In reality, Ford had been granted low-cost BioZone shares for writing the article, which had been commissioned and guided by O'Rourke and Honig. In addition, Keller had seen and approved the article before its publishing.

141.    Defendants Honig and O'Rourke used the trading activity on September 23, 2013 to facilitate payment to Defendant Ford for his September 26, 2013 *Seeking Alpha* article. Defendant O'Rourke called Defendant Ford an instructed him to place buy orders for BioZone stock at $0.40 per share, well below the price that BioZone shares were trading on September 23, 2013. Defendant Honig sold 180,000 shares of BioZone to Defendant Ford at $0.40 in a coordinated trade.

142.    Defendant Ford has published numerous articles touting companies associated with Defendant Frost, including MusclePharm Corporation and Opko. Due to his involvement in the Pump & Dump Misconduct, Defendant Ford was a named defendant in the SEC Action. He entered

into a settlement with the SEC, and judgment was entered against him on September 21, 2018, as discussed further below.

143.    The price per share of BioZone responded favorably to the above-referenced articles. As a result of the September 26, 2018 *Seeking Alpha* article, the price per share of BioZone stock rose approximately 58% between September 25, 2013 and September 27, 2013, as trading volume exploded, reaching over 4.5 million shares on September 27, 2013. Trading volume would reach 6 million shares on October 2, 2013.

144.    Following the publication of these articles, the Frost Conspirators dumped shares upon the market at artificially inflated prices over a three-month period from September 23, 2013 and December 27, 2013, enriching themselves at the expense of unsuspecting investors to the tune of over $9.25 million. The following chart delineates the approximate dates and amounts of these insider sales:

| Name | Date Range | Shares | Proceeds |
|------|-----------|--------|----------|
| Frost | October 1-4, 2013 | 2 million | $ 1 million |
| Honig | September 23, 2013-December 16, 2013 | 6 million | $ 3.4 million |
| Brauser[13] | September 27, 2013-December 23, 2013 | 2 million | $ 1.2 million |
| Groussman[14] | September 26, 2013-December 18, 2013 | 1.2 million | $ 0.7 million |
| Stetson[15] | September 27, 2013-December 18, 2013 | .5 million | $ 0.3 million |
| O'Rourke[16] | September 23, 2013-December 27, 2013 | .25 million | $.15 million |

**The Individual Defendants Attempt to Obfuscate the Pump & Dump Misconduct While Wasting Corporate Assets**

145.    In the third quarter of 2013, the Company entered into an agreement (the "APA") to sell its operating assets (including its QuSomes technology) to MusclePharm Corporation

---

[13] Includes sales through Grander, Defendant Brauser's investment vehicle.
[14] Includes sales through Melechdavid, Defendant Groussman's investment vehicle.
[15] Includes sales through SCI, Defendant Stetson's investment vehicle.
[16] Includes sales through ATG, Defendant O'Rourke's investment vehicle.

("MusclePharm") in exchange for shares of MusclePharm. As stated in the Company's quarterly report for the quarter ended September 30, 2013, filed with the SEC on November 18, 2013, "Upon closing, the Company will have a material stock ownership of MusclePharm Corporation ("MSLP"), cash, expects to have no liabilities and only one employee of the Company."

146.   The Company received 1.2 million shares of MusclePharm stock in the APA, valued at nearly $11.1 million on November 13, 2013, the day the asset purchase agreement was signed. MusclePharm received BioZone's intellectual property and one of its manufacturing sites On November 13, 2013, BioZone stock closed at $0.64 per share, for a market capitalization of more than $44.8 million, far in excess of the approximately $11.1 million received through the asset purchase agreement with MusclePharm. Clearly, the APA benefitted MusclePharm shareholders to the detriment of BioZone's shareholders.

147.   Defendant Frost was a large investor in MusclePharm, and a member of its Scientific Advisory Board at the time the APA was signed. Defendant Honig (through GRQ), and Defendant Groussman (through Melechdavid) both had significant shareholdings of MusclePharm as of March 29, 2013, and Honig even had a consulting contract with MusclePharm until, at the earliest, July of 2013. In 2013, according to the SEC, Defendants Brauser, Honig, O'Rourke, and Stetson held control over MusclePharm's leadership and actions, but Defendant Maza did not know of the APA until after it was completed.

148.   The APA, which sold off nearly all of BioZone's assets, rendered the company a public shell, ripe for use in another reverse merger. This time, Defendants Brauser and Honig, with Frost's approval, initiated a reverse merger with Cocrystal Discovery, Inc. in January 2014. Three entities intimately connected to Defendant Frost—Teva Pharmaceutical Industries, The Frost Group, and Opko—had invested in Cocrystal Discovery, Inc., owning in total about 40% of that

company. Under the merger agreement, shareholders of Cocrystal Discovery, Inc. received shares of BioZone's Series B Convertible Preferred Stock as consideration and would in total own 60% of the new company. BioZone's shareholders would own 40% of the new company.

149.    BioZone issued a press release on November 27, 2013 announcing its merger with Cocrystal Discovery, Inc. On January 2, 2014, the merger was completed. Defendant Frost, a director on Cocrystal Discovery's Board since 2008, maintained this position at the new entity.

150.    On March 18, 2014, the combined entity reincorporated in Delaware as Cocrystal Pharma, Inc. About a month later, on April 15, 2014, the new Company announced the change of its ticker symbol from "BZNE" to "COCP."

**The SEC's Complaint Allegations**

151.    According to the SEC, "[a]t the center" of the various schemes described herein were Defendants Brauser, Honig, O'Rourke, and Stetson (and their investment vehicles), though the agency characterized Defendant Honig as the plot's "primary strategist." The slightly larger group of Defendants Brauser, Ford, Frost, Groussman, Honig, O'Rourke, and Stetson (with their investment vehicles) had perpetrated several pump-and-dump schemes together over several years. They apparently often shared business addresses and co-owned companies through which they covertly operated to conceal the true nature of their involvement in the schemes.

152.    According to the SEC, there were at least 19 instances from about 2011 to 2019 during which Defendants Brauser, Honig, O'Rourke, and Stetson invested in the same company's stock, an endeavor in which they were frequently joined by Defendant Frost. This behavior of group investment and manipulation followed a pattern that can be seen in the Pump & Dump Misconduct.

153.    This core group typically picked out a company to acquire, and then designed the financing to grant the group's members and choice associates controlling positions by buying up the common stock at very low prices. Once the group and its affiliates had control of the company, and could direct its decisions, they would manufacture an event (typically with an article from Defendant Ford or a large investment by Defendant Frost) to generate public interest and raise the stock price. After the price was artificially boosted, the insiders' shares were then sold off for millions of dollars in profit, often in staggered transactions over weeks or months to minimize suspicion.

154.    According to the SEC, Defendants Brauser, Honig, O'Rourke, and Stetson corresponded almost every day, an unsurprising fact given that they typically used the same office. Defendant Frost leased part of his own Miami office building to Defendants Brauser and Honig from at least October 2010 to 2013.

155.    Defendant Ford, in addition to covering BioZone in his writings for *Seeking Alpha*, also promoted Opko, Pershing Gold Corp., MusclePharm, ChromaDex Corp., and Vringo, Inc., all of which were controlled by Frost or an associate. The SEC's Complaint states that Ford was paid in November and December of 2013 by none other than Defendants Brauser, Honig, and O'Rourke to write another article promoting Opko.

156.    The SEC's Complaint identifies other companies, called "Company B" and "Company C," through which Defendants Brauser, Honig, and associates executed another pump-and-dump conspiracy. Company B and Company C were quickly identified as MabVax Therapeutics, Inc. ("MabVax") and MGT Capital Investments, Inc. ("MGT"), respectively.

157.    According to the SEC, Defendant Honig demanded that both BioZone and MabVax employ the legal services of Harvey Kesner and his firm. Kesner resigned from his position as a

partner at the firm shortly before the SEC's Complaint was filed. A *Barron's* article published on October 4, 2018 detailed how Kesner had represented 22 companies financed by one of the defendants in the SEC's Complaint.

158.    Defendants Brauser, Frost, Groussman, Honig, and Stetson also invested together in several penny stocks that showed all the signs of a pump-and-dump operation. These stocks included: (i) VBI, in which Opko and Defendants Brauser and Honig invested; (ii) ChromaDex, about which Defendant Ford wrote an article, Defendants Brauser and Honig co-chaired, and in which Opko and FGIT invested; (iii) MusclePharm, in which MGT and Defendants Brauser and Honig invested; (iv) Sevion, in which Opko and Defendants Brauser and Honig invested; (v) TransEnterix, Inc., in which FGIT and Defendant Brauser invested; (vi) IZEA, Inc., in which FGIT and Defendants Brauser and Honig invested; (vii) Pershing Gold, which was managed by Defendant Honig and in which FGIT invested; and (viii) PolarityTE, Inc., in which FGIT and Defendants Brauser and Honig invested; Defendant Stetson was also its CEO until the SEC's Complaint triggered his termination.

159.    After the SEC's Complaint revealed the truth of the Defendants' conduct, Defendants Brauser, Frost, Groussman, Honig, O'Rourke, and Stetson, and others, were soon embroiled in a number of other securities suits, facing claims of millions of dollars. These actions include, but are not limited to: *Guyer v, MGT Capital Investments, Inc.*, No. 18-cv-9228 (S.D.N.Y.), *In re Opko Health, Inc. Sec. Litig.*, No. 18-cv-23786-JEM (S.D. Fla.), and *Takata v. Riot Blockchain, Inc.*, 18-cv-2293 (D.N.J.).

160.    Aside from the key investors in these schemes, Defendants Ford and Honig also had an established arrangement by which Defendant Ford would write articles promoting the company or companies of Defendant Honig's choosing, always for undisclosed compensation.

According to the SEC, this deal was struck during the pair's first meeting in San Francisco during the summer of 2012. Thereafter, from 2012 to 2015, Defendant Ford went on to pen several articles endorsing companies owned by Defendant Honig and his associates named herein, often actually corresponding with Defendants O'Rourke and Stetson.

161.    Ford's payment for these articles apparently came in the form of access to private securities transactions as well as below-market private placements for entities under the control of Honig or an associate. In addition, Defendant Ford received at least $125,000 in cash during this time from 2012 to 2015, though the payments themselves were staggered and resourced to elude detection. For example, third parties related to Honig became, with Ford, party to fictitious consulting agreements.

162.    The SEC asserts that Defendants Brauser, Honig, O'Rourke, and Stetson knew both that Ford had been paid to write his articles and that the articles did not disclose those payments. This was evident from several emails exchanged among these defendants, including one from November 2013 wherein Honig wrote that "we are assisting" with the "John Ford article," in a chain of emails about Opko promotions. Defendants Brauser and O'Rourke were copied on this email. Later, Defendant O'Rourke sent Brauser a link to the finished article in December 2013, which failed to disclose that Ford had been paid to write it.

**Materially False and Misleading Statements**

163.    Despite the involvement of the Individual Defendants in the Pump & Dump Misconduct, the Company failed to disclose the Pump & Dump Misconduct, its potential effects on the Company, or the fact that the APA was a material related party transaction, during the Relevant Period.

164.    On September 26, 2013, the Ford Article was published on *Seeking Alpha*. The article included an interview with Defendant Keller, in which Defendant Keller was quoted as

promoting the benefits of BioZone's QuSomes technology, including a false and misleading assertion that BioZone had a formulation ready to be tested and introduced to the billion-dollar injectable drug market. At the time this statement was made, Defendant Keller was aware that the Company had not developed such a product, and BioZone's R&D efforts had ceased in mid-2012, ending efforts to develop QuSomes technology.

165.    The Ford Article further failed to disclose that Defendant Ford had received compensation for the Ford Article, stating instead, "I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

166.    The Ford Article was false and misleading because it failed to disclose that: (1) the Company's research and development efforts had been halted in mid-2012; and (2) Defendant Ford received payment in the form of BioZone shares for publishing the article filled with positive information about BioZone.

167.    Non-defendant Samuel J. Rae, another stock promoter, wrote almost half of his roughly 180 investing articles from the past five years about companies related to Defendants Brauser, Frost, Honig, and their associates. For example, Rae published an article touting BioZone on September 30, 2013, only four days after Ford's *Seeking Alpha* article on the same topic. Rae's article, which was posted to Benzinga.com, also emphasized the same aspects of BioZone as the Ford Article: Defendant Frost's investment in the company and its QuSomes technology. The Frost Conspirators have maintained control over Rae in the years following the merger, as evidenced by Rae's enduring relationship with—and promotion of—entities linked with those defendants, especially Defendant Honig.

168.     On November 18, 2013, BioZone filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2013 (the "2013 Q3 10-Q"). The 2013 Q3 10-Q was signed by Defendant Maza.

169.     The 2013 Q3 10-Q contained a section about the Company's agreement to sell nearly all of its assets off to MusclePharm, stating, in relevant part:

> …in November 2013, the Company entered into an Asset Purchase Agreement (the "November APA") with MusclePharm Corporation ("MusclePharm"). In connection with the November APA, the Company agreed to sell substantially all of the Company's operating assets including the QuSomes, HyperSorb and EquaSomes drug delivery technologies (excluding certain assets including cash on hand) for 1,200,000 shares of MusclePharm's common stock.

170.     Attached to the 2013 Q3 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendant Maza, attesting to the accuracy of financial reporting in the 2013 Q3 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

171.     On March 31, 2014, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Wilcox, McGuire, Frost, and Rubin.

172.     Attached to the 2013 10-K were SOX Certifications signed by Defendants Wilcox and McGuire, attesting to the accuracy of financial reporting in the 2013 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

173.     On April 4, 2014, the Company filed its amended annual report on Form 10-K/A with the SEC for the fiscal quarter and year ended December 31, 2013 (the "2013 10-K/A"). The 2013 10-K/A was signed by Defendants Wilcox, McGuire, Frost, Hsiao, and Rubin.

174.    In reference to the APA, the 2013 10-K/A simply stated that "[o]n January 2, 2014, the Company sold substantially all its operating assets, including its manufacturing facility in California, to Musclepharm Corporation ('Musclepharm'), a public company trading on the OTCBB, in exchange for 1,200,000 shares of Musclepharm common stock…"

175.    Attached to the 2013 10-K/A were SOX Certifications signed by Defendants Wilcox and McGuire, attesting to the accuracy of financial reporting in the 2013 10-K/A. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

176.    On March 31, 2015, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Wilcox, Schinazi, Frost, Hsiao, Meckler, Rubin, and McGuire.

177.    In reference to the APA, the 2014 10-K stated that "[o]n January 2, 2014, the Company sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')…"

178.    The 2014 10-K also stated that the Company's "financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

179.    Attached to the 2014 10-K were SOX Certifications signed by Defendants Wilcox and McGuire, attesting to the accuracy of financial reporting in the 2014 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

180.    On March 15, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Meckler, Schinazi, Block, Frost, Hsiao, Rubin, Wilcox and Dale.

181.    In reference to the APA, the 2015 10-K stated that "[o]n January 2, 2014, the Company sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')…"

182.    Attached to the 2015 10-K were SOX Certifications signed by Defendants Meckler and Dale, attesting to the accuracy of financial reporting in the 2015 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed, and that its "financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

183.    On March 31, 2017, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Wilcox, Schinazi, Block, Frost, Hsiao, Rubin and Martin.

184.    In reference to the APA, the 2016 10-K stated, that "[o]n January 2, 2014, Biozone Pharmaceuticals, Inc. sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')…"

185.    Attached to the 2016 10-K were SOX Certifications signed by Defendants Wilcox and Martin, attesting to the accuracy of financial reporting in the 2016 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed, and that [t]he [Company's] financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

186.    On March 21, 2018, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Wilcox, Schinazi, Block, Frost, Hsiao, Rubin, and Martin.

187.    In reference to the APA, the 2017 10-K stated, that "[o]n January 2, 2014, Biozone Pharmaceuticals, Inc. sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')…"

188.    Attached to the 2017 10-K were SOX Certifications signed by Defendants Wilcox and Martin, attesting to the accuracy of the financial reporting in 2017 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed, and that its "financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

189.    The statements referenced in ¶¶ 164-188 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company was the subject of the Pump & Dump Misconduct; (2) Defendants failed to disclose that MusclePharm was a related party, in violation of GAAP and SEC rules and regulations; (3) as a result of the foregoing, the Company would be subject to regulatory scrutiny from government agencies, including the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

190.    On April 30, 2019, the Company issued the 2018 Proxy Statement. Defendants Wilcox, Schinazi, Block, Frost, Hsiao, and Rubin solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[17]

---

[17] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.

191.     The 2018 Proxy Statement stated, regarding the Company's Code of Ethics, that:

Our Board has adopted a Code of Ethics that applies to all of our employees, including our Chief Executive Officer and Chief Financial Officer, as well as our Board. The Code of Ethics provides written standards that we believe are reasonably designed to deter wrongdoing and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, full, fair, accurate, timely and understandable disclosure and compliance with laws, rules and regulations, including insider trading, corporate opportunities and whistle-blowing or the prompt reporting of illegal or unethical behavior.

192.     The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as multiple Individual Defendants allowed false and misleading statements to be issued to the investing public, and three of the Individual Defendants sold Company shares on inside information.

193.     Further, the 2018 Proxy Statement failed to disclose that: (1) the Company was the subject of the Pump & Dump Misconduct; (2) Defendants failed to disclose that MusclePharm was a related party, in violation of GAAP and SEC rules and regulations; (3) as a result of the foregoing, Cocrystal would be subject to regulatory scrutiny from government agencies, including the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Individual Defendants Remained Connected to Cocrystal**

194.     MDM Worldwide Solutions, Inc. ("MDM") was Cocrystal's investor relations firm from at least May 24, 2014 (when MDM first appeared on Company press releases) until 2016. The Company's MDM contact on the press releases is partner David Zazoff, who was also hired

---

Plaintiffs specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

by BioZone for its investor relations from at least its press release dated July 8, 2011. Then, Zazoff was ZA Consulting, Inc.'s Managing Director.

195.     Defendant Honig had apparently worked with Zazoff before to 'pump' stock prices before, according to testimony from Joel Noel, who took a plea deal in June 2014 in connection with securities fraud at YesDTC Holdings, Inc ("YesDTC"). According to Noel, Defendant Honig had introduced him to Zazoff, whom Honig described as "a magic maker who could make the price of YesDTC stock rise through his services." Noel went on to say that Honig had told him "that I should not ask questions about how Zazoff achieved his success." From the spring of 2010 to July 2011, Zazoff promoted YesDTC's stock.

196.     Collectively, MDM, Zazoff, and firms associated with Zazoff have been hired for investor relations by at least ten companies funded or founded by Defendant Honig and associates, including BioZone and MabVax.

197.     The Individual Defendants have maintained control over Zazoff in the years following the merger, as evidenced by Zazoff's enduring relationship with—and promotion of— entities linked with those defendants, especially Defendant Honig.

**The Truth Begins to Emerge**

198.     On September 7, 2018, the SEC issued a press release announcing the filing of a complaint (the "SEC's Complaint") against, *inter alia*, Defendant Frost, Cocrystal, and FGIT. The release, titled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes," stated, in relevant part:

> *The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.*

According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes. ***Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes***. Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, ***Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors***.

"As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement. "They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."

***The SEC's complaint***, which was filed in federal district court in Manhattan, ***charges Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman, Frost, Elliot Maza***, Robert Ladd, ***Brian Keller, John H. Ford***, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., OPKO Health Inc., Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital Investments Inc. ***with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief***.

(Emphasis added.)

199.    Though BioZone was termed "Company A" in the SEC's complaint, it was immediately obvious that it was the company involved in the pump and dump schemes with at least two other entities. The SEC complaint also revealed that MusclePharm had been a related party and affiliate of BioZone; thus, the APA was a material related party transaction that should have been disclosed as such under federal securities laws and GAAP").[18] *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X.

---

[18] Under ASC 850, public companies' "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1. The NASDAQ, on which the Company's stock traded and still trades, also explicitly requires GAAP compliance.

200.     The Frost Conspirators were clearly cognizant of the fact that MusclePharm was an affiliate of the Company under GAAP. As experienced businessmen, they were well aware that the Financial Standards Accounting Board defines an affiliate as "a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity,"[19] and that their group, especially Defendant Frost, controlled MusclePharm.

201.     Under SEC Rule 4-01(a) of Regulation S-X, SEC filings that do not comport with GAAP "will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). To be comport with GAAP, BioZone was required to include in its disclosure: (i) how it was connected to MusclePharm; (ii) a full summary and explanation of transactions with MusclePharm and their effects on BioZone's other financial statements; (iii) dollar amounts for all transactions between the two companies that took place during the reporting period; (iv) amounts owed to or from MusclePharm as of the date of BioZone's balance sheet, with an explanation of how accounts will be settled. ASC 850-10-50-1.

202.     After the SEC's press release, the price of Cocrystal stock dropped $0.54 per share, or 14.4%, from the previous day's closing price, closing at $3.20 per share a on September 7, 2018. The share price continued to fall, closing at $3.20 on September 10, 2018, the following trading day.

203.     On September 20, 2018, Defendant Frost resigned from his position as non-Executive Chairman at Ladenburg Thalmann Financial Services, a Florida brokerage firm of which he owned 36% at the time.[20]

---

[19] https://www.investopedia.com/ask/answers/06/subsidiaries.asp. Last visited August 14, 2019.
[20] Bruce Kelly, *Ladenburg chairman Phillip Frost steps down*, INVESTMENTNEWS (Sept. 21, 2018, 9:54 PM), https://www.investmentnews.com/article/20180921/FREE/180929979/ladenburg-chairman-phillip-frost-steps-down. Last visited August 13, 2019.

204.    On September 21, 2018, the Court in the SEC Action entered a judgment against Defendant Ford after he agreed to settle the SEC Action. Ford settled without admitting or denying the allegations against him, in exchange for prohibitions on violating the federal securities laws in the future, a permanent bar from participating in any offering of penny stock, a civil penalty, disgorgement of all gains and prejudgment interest thereon. The amount of disgorgement and the civil penalty remain to be determined by the Court.

205.    On December 27, 2018, Defendant Frost and two of the entities in his control (FGIT and Opko) settled the SEC action against them in separate judgments. Defendant Frost agreed to, *inter alia*: pay a civil penalty of $5 million and $433,181 in disgorgement with interest of $90,206, and to be permanently barred from participating in offerings of penny stock (with limited exceptions). This latter provision effectively blocks Frost from accessing the small-cap market that had long been considered an area of his particular skill. This fact, taken together with his willingness to pay damages over ten times as much as his unlawful proceeds, indicate the egregious nature of Defendant Frost's wrongdoing.

206.    In his settlement agreement, Frost also agreed to a permanent injunction against violating various federal securities laws, including Section 17(a)(2), Section 13(d) and Rule 13d-1(a), and Sections 5(a) and 5(d). These provisions outlaw materially false statements or omissions in securities sales, failure to file Schedule 13D stock ownership reports, and the sale of unregistered securities, respectively.

207.    FGIT also agreed to an injunction from violating Section 17(a)(2) and from participating in any penny stock offering. Opko was subject to more sanctions: its judgment entailed a civil penalty of $100,000, engaging an SEC-approved independent consultant to review its Section 13(d) compliance, and establishment of a Management Investment Committee to advise

and make recommendation to its Board's Independent Investment Committee that oversees its investments. Finally, Opko also agreed to a permanent injunction against violations of Section 13(d) and Rule 13d-1(a).

208.     On January 18, 2019, Defendant Groussman (acting with Melechdavid) agreed to pay $1,051,260 in disgorgement, with $170,555 in interest and a $160,000 penalty. These monetary penalties were supplemented by injunctions against violations of Section 10(b) and 13(d) of the Exchange Act, Rules 10b-5 and 13d-1(a), Sections 5 and 17(a) of the Securities Act, as well as a five-year injunction against participating in any offering of penny stocks.

209.     On March 8, 2019, the SEC filed its first amended complaint [21] against the remaining defendants that had not already agreed to settlements (the "First Amended Complaint"). The First Amended Complaint included a number of non-public documents and statements, as well as accounts of private meetings, that may be presumed to have resulted from interviews, subpoenas, and informal document requests from the SEC.

210.     On March 21, 2019, Defendant Maza settled with the SEC, agreeing to an injunction against violations of Section 10(b) of the Securities Act, Rule 10b-5, Section 17(a) of the Exchange act, and from aiding and abetting violations of Rule 15d-1 and Section 15(d) of the Exchange Act. Whether Defendant Maza will owe disgorgement, civil penalties, or interest remains to be decided by the court.

211.     On March 26, 2019, Defendant Keller settled with the SEC, agreeing to an injunction against violations of Sections 10(b) and 15(d) of the Exchange Act, Section 17(a) of the Securities Act, and Rules 10b-5 and 15d-1. He also agreed to an injunction against serving as a director or officer for a public company or participating in any offering of a penny stock. Defendant

---

[21] *SEC v. Honig et al.*, No. 1:2018cv08175 (S.D.N.Y).

Keller also agreed to pay disgorgement, civil penalties, and interest (in amounts to be determined by the court).

212.    On June 17, 2019, Defendant Honig settled with the SEC, agreeing to permanent injunctions against violations of Sections 9(a)(1), 9(a)(2), 10(b), and 13(d) of the Exchange Act, Sections 5 and 17(a) of the Securities Act, and Rules 10b-5 and 13d-1(a). He also submitted to a permanent bar from participation in any offering of penny stock, or any funding or beneficial ownership of more than 5% of any issuer of penny stocks. Defendant Honig also agreed to pay disgorgement, civil penalties, and interest (in amounts to be determined by the court).

## DAMAGES TO COCRYSTAL

213.    As a direct and proximate result of the Individual Defendants' conduct, Cocrystal is losing and expending many millions of dollars.

214.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its CFO, its former CEO, two of its former CFOs, and the former CEO & CFO of BioZone, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

215.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

216.    Such losses include the loss of value from the sale of substantially all of BioZone's assets to MusclePharm for consideration equal to approximately one-quarter of BioZone's market capitalization at the time.

217.    As a direct and proximate result of the Individual Defendants' conduct, Cocrystal has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment and waste of corporate assets.

## DERIVATIVE ALLEGATIONS

218.   Plaintiffs bring this action derivatively and for the benefit of Cocrystal to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Cocrystal, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as the Outside Individual Defendants' aiding and abetting thereof.

219.   Cocrystal is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

220.   Plaintiffs are, and have been at all relevant times, shareholders of Cocrystal. Plaintiffs will adequately and fairly represent the interests of Cocrystal in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

221.   Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

222.   A pre-suit demand on the Board of Cocrystal is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Frost, Hsiao, and Rubin, and Wilcox (the "Director-Defendants") and non-Defendants Todd Brady and Anthony Japour. Plaintiffs need only to allege demand futility as to three of the six Directors that are on the Board at the time this action is commenced.

223.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

224.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

225.    Additional reasons that demand on Defendant Frost is futile follow. Defendant Frost has served as a Company director since 2014 (as a director of Cocrystal Discovery, Inc. prior to the Merger) and is a member of the Audit Committee. Defendant Frost signed, and thus personally made the false and misleading statements in, the 2013 10-K, 2013 10-K/A, 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. His insider sales before the fraud was exposed, which yielded approximately $1.1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Frost is a defendant in the both the SEC Action and the Securities Class Action, in addition to numerous securities class actions pending across the country against Defendant Frost and Opko (among others) arising from the Pump & Dump Misconduct at BioZone and elsewhere (the "Opko Class Actions").[22] For these reasons, too, Defendant Frost breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

226. Additional reasons that demand on Defendant Wilcox is futile follow. Defendant Wilcox has served as CEO since July 2016, as a director since January 2014, and as Chairman since February 1, 2019. Thus, as the Company admits in the 2018 Proxy Statement, Defendant Wilcox is a non-independent director. Defendant Wilcox receives handsome compensation for his services to Cocrystal, including over $558,352 in 2018. Defendant Wilcox signed, and thus personally made the false and misleading statements in, the 2013 10-K, 2013 10-K/A, 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As the Company's highest officer and as a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Wilcox is a Defendant in the Securities Class Action. For these reasons, too, Defendant Wilcox breached his fiduciary

---

[22] These include numerous lawsuits filed in Florida state court as well as in the Tel Aviv Israel District Court.

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Additional reasons that demand on Defendant Rubin is futile follow. Defendant Rubin has served as a Company director since 2014, as a director of Cocrystal Discovery, Inc. prior to the Merger. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Rubin signed, and thus personally made the false and misleading statements in, the 2013 10-K, 2013 10-K/A, 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Further, Defendant Rubin has strong personal and professional connections with Defendant Frost. Defendant Rubin has served as a director and Executive Vice President-Administration of Opko for over 12 years, and he receives handsome compensation for his roles at Opko, including $1.46 million in 2018. Defendant Frost is Chairman and CEO of Opko, and therefore, Defendant Rubin is beholden to Defendant Frost. Defendant Rubin is also a member and Vice President of the Frost Group LLC, a four-member private investing firm in which Defendant Hsiao is also a member and of which Defendant Frost is the founder and sole indirect owner. In 2017, *Forbes* reported that Defendant Rubin is a "regular lunch mate" of Defendant Frost, and the two men have frequent face to face meetings.[23] Further,

---

[23]  Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/ #b47517f7306b.

Defendant Rubin has been involved in securities violations with Defendant Frost in the past. A class action lawsuit for violations of the securities laws was filed in 2010 in the Southern District of Florida against Searchmedia Holdings Limited and Defendants Frost and Rubin (among others), and the case was partially settled in 2013 for consideration of $2.75 million. Thus, for these reasons, too, Defendant Rubin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

228.   Additional reasons that demand on Defendant Hsiao is futile follow. Defendant Hsiao has served as a Company director since 2014, as a director of Cocrystal Discovery, Inc. prior to the Merger, and currently serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Hsiao signed, and thus personally made the false and misleading statements in, the 2013 10-K/A, 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. She also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Defendant Hsiao also shares a close relationship with Defendant Frost, who faces a substantial likelihood of liability in the SEC Action and the Securities Class Action. Defendant Hsiao has served as Vice-Chairman, Chief Technical Officer, and a director of Opko for over 12 years, and she receives handsome compensation from Opko, including over $1.97 million in 2018. She is also one of the four members of the Frost Group, along with Defendants Frost and Rubin, with Frost as the sole indirect owner. In profiling Defendant Hsiao, *Forbes* described her as

Defendant "Frost's close confidante and business partner [who] has been working with him for year[s] at various pharma outfits." In January 2017, *Forbes* reported that Defendant Frost "lunches daily with senior executives, including Dr. Jane Hsiao... whose late husband, Charles, cofounded Ivax with Frost."[24] Defendant Hsiao also coordinated with Defendant Frost to perpetrate the Pump & Dump Misconduct. A pro se action filed in the United States District Court for the District of Minnesota for fraud and tortious interference with prospective business advantage alleges that Defendant Keller represented to the pro se plaintiff that Defendant Hsiao was involved in negotiating with Nian Wu, a chemist involved with BioZone in response to the pro se plaintiff's assertion to Defendant Keller that activities of the Frost Conspirators at BioZone constituted fraud. Defendant Hsiao has stuck by Defendant Frost through her professional efforts, charitable donations, and investments. In a conference call held with analysts and investors of Opko on March 1, 2018, Defendant Frost highlighted the fact that he had invested "an additional $25 million into [Opko], alongside my colleague Dr. Jane Hsiao." The Phillip and Patricia Frost Museum of Science includes the Hsiao Family Special Exhibition Gallery. Further, as recently as June 2018, Defendant Hsiao's Jane Hsiao Asian Art Endowment funded an exhibit at the Frost Art Museum at Florida International University, underscoring the depth of her social and professional connections with Defendant Frost. Thus, for these reasons, too, Defendant Hsiao breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

229.    Additional reasons that demand on the Board is futile follow.

---

[24] Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

230.   As described above, one of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendant Frost received proceeds of approximately $1.1 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and thus excused.

231.   Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, one of whom is a defendant in both the SEC Action and the Securities Class Action, and another of whom is named as a defendant in the Securities Class Action, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

232.   Defendants Frost, Hsiao and Rubin have particularly strong personal connections which prevent them from evaluating a demand with independence or disinterest, especially in light of the substantial likelihood of liability that Defendant Frost faces in the SEC Action, the Securities Class Action, and the Opko Class Actions. These connections are as follows.

233.   Defendants Frost, Hsiao and Rubin have connections dating back decades through IVAX Corporation ("IVAX"). The tenures of these Individual Defendants at IVAX overlap as follows:

(a)   Defendant Frost was the CEO & Chairman from 1987 to 2006.

(b)   Defendant Hsiao was the Vice Chair–Technical Affairs from 1995 to 2006.

(c)      Defendant Rubin was the General Counsel and Secretary from 2001 to 2006.

234.      Directors Frost, Hsiao, and Rubin also are each members of The Frost Group, LLC, a private equity firm specializing in PIPE investments founded in 2006. As of March 29, 2013, The Frost Group, LLC possessed 7.7% of the Company's outstanding stock.

235.      The strong connections between Directors Frost, Hsiao, and Rubin are further evidenced by their shared memberships on company boards. Directors Frost, Hsiao, and Rubin all currently serve on the board of Opko, which is a named defendant in the SEC Action. Further, all three previously served on the Board of several other companies, including Safestitch Medical, Inc. prior to its merger with TransEnterix and PROLOR Biotech, Inc., prior to its acquisition by the Opko in August 2013.

236.      The Director-Defendants have further connections though shared board service, as follows:

(a)      Defendants Frost and Rubin also both previously served on the boards of: (1) Cogint, Inc.; and (2) Sevion Therapeutics, Inc. prior to its merger with Eloxx Pharmaceuticals, Inc.

(b)      Defendant Frost and Rubin both serve on the board of Castle Brands, Inc.

(c)      Defendant Block is the Founder, Chairman and CEO of Gliknik, Inc. Defendant Schinazi is a director of Gliknik, Inc

(d)      Defendant Hsiao is the board chair of Non-Invasive Monitoring Systems, Inc., where Defendant Rubin also serves as a Director.

Upon information and belief, Directors Frost, Hsiao, Rubin, Block and Schinazi have developed social and professional connections as a result of their shared service on these boards. As a result of these long-time personal and professional connections, combined with the substantial likelihood

of liability that Defendant Frost faces in the SEC Action and the Securities Class Action, none of Director-Defendants can evaluate a demand with independence, and thus, demand is excused.

237.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

238.    Cocrystal has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Cocrystal any part of the damages Cocrystal suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

239.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

240.    The acts complained of herein constitute violations of fiduciary duties owed by Cocrystal's officers and directors, and these acts are incapable of ratification.

241.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Cocrystal. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Cocrystal, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

242.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Cocrystal to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

243.    Thus, for all of the reasons set forth above, four of the Directors, or certainly at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

244.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

245.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

246.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

247.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

248.    Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose, inter *alia*, that: (1) the Company was the subject of the Pump & Dump Misconduct; (2) Defendants failed to disclose that MusclePharm was a related party, in violation of GAAP and the SEC; (3) as a result of the foregoing, the Company would be subject to regulatory scrutiny from government agencies, including the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

249.    Moreover, the 2018 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them, including three of the Individual Defendants engaging in insider sales of Company stock while in possession of material, non-public information.

250.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including, but not limited to, election of directors, approval of executive compensation, and appointment of an independent auditor.

251.    The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Schinazi, Wilcox, Block Frost, Hsiao, and Rubin, which allowed them to continue breaching their fiduciary duties to Cocrystal.

252.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

253.    Plaintiffs on behalf of Cocrystal have no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

254.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

255.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cocrystal's business and affairs.

256.    Each of the Individual Defendants violated and breached his, her or its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

257.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cocrystal.

258.    In breach of their fiduciary duties owed to Cocrystal, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company was the subject of the Pump & Dump Misconduct; (2) Defendants failed to disclose that MusclePharm was a related party, in violation of GAAP and SEC rules and regulations; (3) as a result of the foregoing, the Company would be subject to regulatory scrutiny from government agencies, including the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

259.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and

omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

260.    Additionally, three Individual Defendants engaged in lucrative insider sales while the price of the Company common stock was artificially inflated due to the Pump & Dump Misconduct and the false and misleading statements of material fact described herein.

261.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

262.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Cocrystal's securities and disguising insider sales.

263.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of Cocrystal's securities and engaging in insider sales.

264.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

265.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cocrystal has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

266.   Plaintiffs on behalf of Cocrystal have no adequate remedy at law.

## THIRD CLAIM

### Against the Outside Individual Defendants for Aiding and Abetting Breach of Fiduciary Duties

267.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

268.   The Outside Individual Defendants aided and abetted the Individual Defendants, and who breached their fiduciary duties to the Company.

269.   The Outside Individual Defendants misconduct resulted in continuous, connected, and on-going harm to the Company.

270.   Specifically, Defendant Stetson made false and misleading statements regarding Defendant Honig's connection to the Company in order to facilitate Defendant Honig's sale of BioZone stock. Defendants Groussman and O'Rourke engaged in manipulative trading in order to inflate the price of BioZone stock and create the false impression of market interest. Defendant O'Rourke facilitated Defendant Frost's payment for the Frost Article with below market price BioZone shares. Defendant Ford wrote at least one article promoting BioZone stock at the direction of Defendant O'Rourke in exchange for below market shares of BioZone stock, without revealing

that he was compensated for writing such article.

271.    Further, Defendants Stetson, Grossman and O'Rourke engaged in lucrative insider sales while the price of the Company common stock was artificially inflated due to the Pump & Dump Misconduct and the false and misleading statements of material fact described herein.

272.    The Outside Individual Defendants are jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

273.    As a direct and proximate result of The Outside Individual Defendants' aiding and abetting of the Company's directors', officers', and controlling shareholders' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages. Plaintiffs on behalf of Cocrystal have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

274.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

275.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cocrystal.

276.    The Individual Defendants either benefitted financially from the Pump & Dump Misconduct or based on improper conduct received bonuses, stock options, or similar compensation from Cocrystal that was tied to the performance or artificially inflated valuation of Cocrystal, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

277.    Plaintiffs, as shareholders and representatives of Cocrystal, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, and/or excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

278.    Plaintiffs on behalf of Cocrystal have no adequate remedy at law.

## FIFTH CLAIM

### Derivatively Against Individual Defendants for Waste of Corporate Assets

279.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

280.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets by selling substantially all of BioZone's assets to MusclePharm (an entity in which Defendant Frost was a significant investor) in exchange for inadequate consideration.

281.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

282.    Plaintiffs on behalf of Cocrystal have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Cocrystal, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that each of the Individual Defendants breached or aided and

abetted the breach of their fiduciary duties to Cocrystal;

(c)     Determining and awarding to Cocrystal the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Cocrystal, the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cocrystal and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Cocrystal to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Cocrystal restitution from each of the Individual Defendants and Outside Individual Defendants;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated: August 15, 2019

Respectfully submitted,

**PAWAR LAW GROUP, P.C.**

*/s/Vik Pawar*
Vik Pawar
20 Vesey Street, Suite 1210
New York, NY 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

*Local Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (pro hac vice
application forthcoming)
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiffs*

## VERIFICATION

I, Sharon Nichols, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct  Executed this 12th day of August, 2019.

SHARON NICHOLS

## VERIFICATION

I, Trent Nichols, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of August, 2019.

TRENT NICHOLS